IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2018 Session

## STATE OF TENNESSEE v. PATRICIA ANN BINGHAM, a.k.a. PATRICIA ANN STARNES

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-468     Monte D. Watkins, Judge**

_____

### No. M2017-02059-CCA-R3-CD

_____

The Defendant, Patricia Ann Bingham, a.k.a. Patricia Ann Starnes, appeals her jury conviction for aggravated robbery, for which she received a sentence of ten years' incarceration. In this direct appeal, the Defendant alleges the following errors: (1) that the evidence was insufficient to support her conviction, arguing that the State failed to establish beyond a reasonable doubt that she personally assaulted the victim or directed her co-defendant during the robbery and that the State failed to prove that either she or her co-defendant used a deadly weapon to accomplish the robbery; and (2) that trial court failed to properly supervise the jury's viewing of the surveillance video footage and that admission of the entire surveillance video was error because all of the angles contained on the recording were not properly authenticated. Following our review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Manuel B. Russ (on appeal), and Timothy P. Carter (at trial), Nashville, Tennessee, for the appellant, Patricia Ann Bingham, a.k.a. Patricia Ann Starnes.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and M. Kristen Kyle-Castelli and Byron Pugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

A Davidson County grand jury charged the Defendant, along with her co-defendant, Quartez W. Dryden, a.k.a. Quartez W. Drydan, with aggravated robbery of the victim, Charles Reed.  See Tenn. Code Ann. § 39-13-402.  The Defendant and her co-defendant proceeded to a trial by jury in March 2017.

At trial, the victim testified that he was working as a construction worker in Nashville on December 12, 2015.  While on "a break" that day, around noon, he went to a nearby gas station convenience store on Charlotte Avenue to get a snack and a drink.  He was wearing an "orange shirt and blue hard hat" when he entered the store.  After retrieving a beverage and a banana, he approached the cash register to pay.  At that time, there were two cashiers behind the counter and other customers were also present in the store.  The victim reached into his wallet, which contained approximately $240 inside, and gave a cashier a one hundred dollar bill to pay for his purchase.  While the victim was standing at the counter, the co-defendant stood next to him on his left and started talking to him about construction work.  The Defendant was behind him in line.

The victim testified that the co-defendant grabbed for his wallet as soon as he finished putting his change inside.  According to the victim, a struggle over the wallet ensued involving all three individuals.  During the scuffle, the victim fell twice, and the contents of the victim's wallet fell out onto the floor.  The victim stated that the Defendant picked up several of the items that had fallen on the floor before the couple fled.  The defendants stole the victim's social security card, his hunting and fishing license, and approximately $134 in cash from the victim's wallet.  The victim also said that he had several check stubs in his wallet.  The victim testified that he did not consent to the defendants taking his personal belongings and averred that he "struggled like crazy."

In addition, a black box cutter with a silver blade was dropped on the floor during the altercation.  According to the victim, one of his assailants displayed a knife during the altercation, although he could not say whether it was the male or female assailant who displayed the knife because the events happened so quickly.  The victim testified that, before he fell the first time, he saw "a blade come out, and they [were] hollering they [were] gonna cut [him]."  The victim opined that it was the co-defendant who threatened him because it "[s]ounded like a male's voice."  The victim confirmed that the co-defendant did not have anything in his hands initially.

When asked to describe the knife's blade, the victim said that he saw "a shiny and black thing" go by his head as one of them raised their hands up.  The victim agreed that it would "be fair to call" it a "utility knife or box cutter, either one."  Moreover, while the victim confirmed that the box cutter's blade was retracted in the picture taken after the incident, he said that "[i]t was out" during the struggle and was out when it fell to floor.

-2-

According to victim, from the "initial moment when they grabbed [his] wallet," he was "shocked" and caught "plumb off guard." He said that "[i]t kinda startled [him] a little bit[.]" Metro Nashville Police Department ("MNPD") Officer Justin Fox testified that he responded to the gas station, arriving "within anywhere between four to five minutes" after the call, and that the victim appeared "distraught, like the situation was surreal."

In addition, the victim testified that his "hip was bruised" and that he had "a little scratch along [his] cheek" and forehead from the foray. Although the victim went back to work after the robbery and did not seek medical treatment, he said that he was "sore for about three weeks."

The State showed surveillance video from the gas station that captured multiple angles of the incident. The victim narrated the events for the jury as they were happening.

Cashiers Djuana Osborne and Latoyia Grady were behind the counter. Ms. Osborne recounted the events as follows:

> I know [the co-defendant] was behind the man, both of them were behind the man looking at him and his wallet; and I think the [co-defendant] was the one that grabbed the wallet and [the Defendant] was just the backup. But they did wrestle him to the ground to get his wallet, and [the victim] fell.

Explaining the events again, Ms. Osborne said, "I was behind the cash register and then the construction man was in front, and [the co-defendant] was on the right side of him. He stepped back so he could get in front of him and [the Defendant] was on the left." In addition, Ms. Osborne recalled that the co-defendant asked for a "prepaid card" while standing at the counter before grabbing the victim's wallet.

According to Ms. Osborne, the Defendant "had the knife in her hand, . . . and she was like talking to [the co-defendant], telling him to get the man's wallet." Although Ms. Osborne was unsure of the Defendant's exact words to the co-defendant, Ms. Osborne affirmed, "But I do know [the Defendant] was telling him to get the wallet and she had his back." Ms. Osborne described the knife wielded by the Defendant during the attack as "medium," "bigger than a pocket knife," with a blade about five inches long, and "silver [with] some type of design on it." It did not look like a box cutter, in Ms. Osborne's opinion. Furthermore, Ms. Osborne maintained that the Defendant's displaying the knife was what kept her and the other cashier behind the counter.

-3-

Ms. Osborne testified that the co-defendant had a box cutter during the incident but that she did not see the box cutter "until they were going out the door[.]" Ms. Osborne further stated, "[W]e have plenty of box cutters sitting around if he didn't have it on him already." Ms. Osborne could not recall the color of box cutter used, but she thought the store's were silver and not black. In addition, Ms. Osbourne remembered that the co-defendant dropped the box cutter on the ground before they left and that the blade "was out" at that time. Ms. Osborne remembered "[a] man did" touch the box cutter after the events: "It was a customer. And Toyia quickly told him to put it back because it had fingerprints on it."

"[O]ne clip" of the surveillance video footage was played for Ms. Osborne. Ms. Osborne explained for the jury when during the video the defendants drew their weapons.

The other cashier, Latoyia Grady, also testified about the incident and provided details about the robbery. Ms. Grady testified that she first observed the defendants when they came into the store "first asking [her] about loading money onto a card." Ms. Grady confirmed that the co-defendant "never had the prepaid card in his hand," that he just asked about loading money onto a card. Ms. Grady thought the couple was acting "a little suspicious," so she watched them as they moved about the gas station. Ms. Grady said that the co-defendant "acted like he was going back outside to get the card, and [the Defendant] stayed in the store." The Defendant "started pacing." Ms. Grady explained, "She actually was standing and hovering [over] the other customer, and that's what really made me notice her."

Ms. Grady confirmed that the victim was making a purchase from her when the struggle began, that the co-defendant was to the victim's left, and that the Defendant "was like pacing him in the back." When Ms. Grady was asked if she "remember[ed] seeing any weapons used during the robbery[,]" she testified, "I remember seeing the girl with a knife in her hand and then a box cutter, which fell up off of the guy" while he was "running out the door." Explaining it another way, Ms. Grady said that the Defendant's "weapon came out during the struggle. [The co-defendant's] weapon actually fell off his person, like it just got dropped. He never had it out like during the attack." She asserted that she never saw the box cutter in the co-defendant's hands.

Ms. Grady believed that the box cutter was "either gray or black," but she could not recall whether the box cutter's blade was out or retracted. In addition, Ms. Grady confirmed that a customer touched the box cutter after the foray: "One man actually walked in after everything and saw it was on the floor and picked it up like does this belong to anybody, and I told him to put it back down."

Ms. Grady further provided that she dialed 911 shortly "before they ran out" of the store. She described the car that the defendants left in as a "white Nissan," "a sedan like

-4-

vehicle." Ms. Grady also obtained the vehicle's license plate number. She relayed this information to the 911 operator.

The video footage reflected that the co-defendant got inside the driver's side of the vehicle, and the Defendant in the passenger's side. When the defendants were arrested several hours later in a 2006 White Nissan Murano, the victim's social security card and his check stub were found inside the automobile. In addition, the police tried to lift fingerprints from the box cutter left at the scene, but they were unable to find any prints of value.

The victim testified that he was "able to get a good look at both of the people that attacked" him. Ms. Osborne confirmed that she was "standing pretty close to all of this" while it was happening. Ms. Grady testified that she had seen the Defendant before because she "had come into the store like once or twice[.]" The victim, Ms. Osborne, and Ms. Grady were all able to identify the defendants in subsequent photographic lineups. All three also identified the defendants at trial.

MNPD Detective Melody Saxon was the lead detective on this case, and she reviewed the surveillance video footage. She also prepared "some screen shots of the video," which were admitted into evidence. According to Detective Saxon, it appeared to her that the box cutter was extended during the struggle, but it was hard to say with certainty due to the poor quality of the video. However, she confirmed that the video reflected that the box cutter fell in the floor and was in the floor while the victim was still trying to fight off both defendants. She further confirmed that both defendants could be seen "picking items up off the ground that belong to the victim" before fleeing.

In addition, Detective Saxon was asked, "Based on just what you're seeing in the video, can you tell if [the Defendant] is actually fighting with the victim or can you tell if she's just trying to break up the altercation between [the co-defendant] and the victim?" In response, Detective Saxon opined, "If you watch the video from the beginning, it appears to me that [the Defendant] is holding up signs to [the co-defendant] when she's behind the victim; and then at that time it looks like she is tussling with the victim along with [the co-defendant]." When asked to describe the Defendant's specific gestures to the co-defendant, Detective Saxon said, "You can see her hold up her finger right then another time. She keeps holding it up with him. And again. And that's when she changes positions."

Following the conclusion of the proof, the jury found the Defendant guilty as charged. Thereafter, the Defendant was sentenced to ten year's imprisonment at 85%. The Defendant's timely motion for new trial was heard and denied, and a timely notice of appeal was forthcoming.

ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support her aggravated robbery conviction because the State failed to establish beyond a reasonable doubt that she personally assaulted the victim or directed her co-defendant during the robbery and because the State failed to prove that either she or her co-defendant used a deadly weapon to accomplish the robbery; and (2) that trial court failed to properly supervise the jury's viewing of the surveillance video footage and that admission of the entire surveillance video was error because all of the angles contained on the recording were not properly authenticated. We will address each in turn.

## I. *Sufficiency of the Evidence*

The Defendant challenges the sufficiency of the convicting evidence supporting his aggravated robbery conviction. Specifically, the Defendant argues that the State failed to establish her guilt as a principal actor because the proof did not establish that she personally assaulted the victim or that "she used a deadly weapon to take [the victim's] property directly[.]" According to the Defendant, despite evidence that she possessed a weapon, she did not use that weapon to accomplish the robbery. Continuing, she asserts that the State likewise failed to prove all of the elements that she was criminally responsible for the actions of her co-defendant. The Defendant further avers that the State similarly failed to establish that her co-defendant used a deadly weapon to accomplish the robbery, noting that the box cutter found on the floor after the robbery was retracted and that Ms. Grady testified that the box cutter was not in the co-defendant's "hands during the assault." The State counters that the evidence was sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence

is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon [.]" Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. A "taking" or theft of property occurs if, with intent to deprive the owner of property, a person knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

Additionally, the Defendant's guilt in this case was predicated upon a theory of criminal responsibility for the conduct of her co-defendant. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. Dorantes, 331 S.W.3d at 386 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." Dorantes, 331 S.W.3d at 386 (citing State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); see State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Ms. Grady testified at trial that she first observed the defendants when they came into the store together because they were acting "a little suspicious." According to Ms. Grady, the co-defendant acted like he was going back outside to get the prepaid card, and the Defendant stayed in the store and began to pace. Ms. Grady explained that the

Defendant "was standing and hovering [over]" another customer. Once the victim approached the counter, the co-defendant approached him on his left side and began asking him about a construction job. The Defendant placed herself behind the victim and appeared to be sending the co-defendant signals. Ms. Osborne testified that "[the Defendant] was telling him to get the wallet and she had his back."

The victim said that he saw a "utility knife or box cutter, either one," during the attack and averred that his assailants threatened to "cut" him. All witnesses agreed that the box cutter fell to the floor while the struggle continued. The victim said that the box cutter's blade "was out" during the attack and was out when it fell to ground. Ms. Osbourne testified that she saw the co-defendant with a box cutter and that the blade "was out" when it fell to the floor. According to Detective Saxon, it appeared to her that the box cutter was extended during the scuffle, but it was hard to say with certainty due to the poor quality of the video. Moreover, both cashiers stated that another customer picked up the box cutter before the police arrived. In addition, both cashiers testified that they saw the Defendant with a knife while this was taking place. Ms. Osborne described the knife wielded by the Defendant during the attack as "medium," "bigger than a pocket knife," with a blade about five inches long, and "silver [with] some type of design on it." Ms. Osborne stated that she did not intervene because she saw the Defendant's knife. Accordingly, there was sufficient evidence that both the Defendant and her co-defendant used or displayed a deadly weapon during the robbery.

The victim testified that his social security card, his hunting and fishing license, and approximately $134 in cash were missing from his wallet. The victim also had several check stubs in his wallet. The victim stated that the Defendant picked up several of the items that had fallen out of his wallet on the floor before the couple fled. Detective Saxon confirmed that both defendants could be seen "picking items up off the ground" that belonged to the victim before fleeing. When they drove off, the co-defendant was driving, and the Defendant was a passenger. When the defendants were arrested together several hours later in a 2006 White Nissan Murano, the victim's social security card and a check stub were found inside the automobile. The victim's $134 was not recovered. In addition, the victim testified that he did not consent to the defendants taking his personal belongings and averred that he "struggled like crazy."

All of this was captured on surveillance video, which footage was played for the jury and entered as an exhibit. From the evidence presented at trial, when viewed in a light most favorable to the State, we conclude that a reasonable jury could have found the Defendant guilty of the crime as the principal offender or under a theory of criminal responsibility. Therefore, the evidence is sufficient to support the Defendant's conviction for aggravated robbery.

## II. *Video Footage*

The Defendant argues that the trial court erred by allowing the jury to review the entire surveillance video footage during their deliberations. The Defendant's challenge is two-fold—both procedural and substantive. Regarding procedure, the Defendant, citing to Tennessee Rule of Criminal Procedure 30.1 and State v. Jenkins, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992), maintains that "the jury was allowed to improperly focus on particular parts of the videos without any supervision from the trial court to protect [the Defendant's] right to a fair trial." Turning to substance, the Defendant avers that the jury was permitted to view items during their deliberation process that had not been properly authenticated and admitted into evidence, thereby exposing the jurors to improper "extraneous information." The State replies that "the record shows the entire video disc was admitted into evidence, and the trial court properly allowed the jury to review the video disc in the jury room during deliberations."

During the victim's testimony, he was asked to identify the CD of the surveillance video footage, and he affirmed that he had previously viewed the footage and dated and initialed the recording at that time. The following colloquy took place:

Q. Okay. And did you ever see that video right after it happened?
A. Not right after it happened. I didn't see it till later.
Q. Like just a few weeks ago?
A. Yeah.
. . . .
Q. And in the last few weeks, did watch that video?
A. Yes, ma'am. I have.
Q. And did that video show the events like you remembered them?
A. Somewhat. You know. I didn't realize I had swung around as much as I did, but.
Q. Okay. But the vast majority of the facts were the same as you remember them happening?
A. Yeah.
Q. And when you looked at that disk, did you write your initials on that disk and date it?
A. Yes, ma'am. I did.
Q. The court officer is going to hand you a disk. Can you look at that disk and tell me if your initials and the date are present on that disk?
A. Yes, they are, ma'am.

The State then moved the CD into evidence and "publish[ed]" it to the jury. The surveillance video footage was entered into evidence in its entirety without objection.

The victim was then shown the surveillance video footage and narrated the events for the jury. The prosecutor stated, "And we're going to watch it from this viewpoint first." Later, the prosecutor noted she was starting the recording over "from a different angle," and the victim, for a second time, described the events as they were occurring. The video was again shown to the victim on cross-examination, although it was not apparent if this was from the same angle or a different one. At no time during the victim's testimony did either counsel note which camera angle was being played.

Ms. Osborne was shown "one clip" during direct examination, and defense counsel asked to "pull up the video" during his cross-examination of Ms. Osborne. It also appeared that Detective Saxon was shown a portion of the recording on redirect examination by the State. However, what specific angles these witnesses were shown was not mentioned.

During closing arguments, the prosecutor noted for the jury, "You can see it on the video. And the video's going to go back with you so you can look at it as many times as you want. Watch [the Defendant] at the beginning." Defense counsel also referenced the video during closing argument: "You saw for yourself, and that's what I've been asking you to do this whole trial, is just watch this video for yourself." Defense counsel also utilized Detective Saxon's still shots during his closing. In her rebuttal argument, the prosecutor noted, "And just like the cameras have stationary views, [the witnesses] all had different points of view."

From our review of the exhibits, we note that there are sixteen camera angles provided on the CD—that only five of those angles capture the events as they occurred inside the store, that one angle shows the defendants' getting into the vehicle and driving away, and that the other ten angles do not reflect any events pertaining to the robbery. We also note that one or multiple angles can be played simultaneously. In addition, it appears that the still images admitted during Detective Saxon's testimony seemingly come from the same camera angle.

After the conclusion of the proof and closing arguments, the jury requested to adjourn deliberations for the evening and return in the morning. That request was granted. At that time, defense counsel inquired about the surveillance video footage:

> [DEFENSE COUNSEL:] I believe we were told by the court officer that they said they wanted to see the video in the morning and they'd be provided with a laptop to do so. Does the court officer play that for them in the jury room or do they do it themselves?

> [THE COURT:] They might set it up, but just let them view it.

[DEFENSE COUNSEL:] Okay. But they're going to be the ones playing it and operating the computer or is that [sic]?

[THE COURT:] You know, I don't know exactly how they do it.

[MR. JONES[1]:] No. We just give it to them and let them do it. Usually, there's somebody back there savvy enough to do it.

[THE COURT:] Yeah. And there's an IT guy, one of the guys, he's IT. Better than those of us in here, I'm sure. So[,] I mean that's the only thing on the video; right?

[DEFENSE COUNSEL:] There are sixteen camera angles and only I think three were presented as evidence in this case.

[THE COURT:] Well. But if the video was admitted into evidence, they have a right to look at all the camera angles, once the video is admitted into evidence.

The following morning, defense counsel lodged a formal objection:

Your Honor, prior to the jury coming out, I would just like to raise a brief issue with the [c]ourt. I asked yesterday about the jury being able to view all the angles on the video that they're going to view today. And I know the [c]ourt's ruling on that from discussion yesterday, but I would just like to make an objection on the record to the fact that only two camera angles were authenticated at trial. And also if the [c]ourt were to rule that they're to be able to watch the whole video, I would just ask that the [c]ourt also instruct them on how to watch all the angles, there are sixteen. When you initially load the program, it only shows four, and I think at least two of the other view would be germane to their discussion. Thank you.

The court replied, "All right." There is no indication in the record that the jury was ever so instructed.

At the motion for new trial hearing, defense counsel maintained that he had consulted with the jury. He stated that, as a result of his consultations, he learned the following:

---

[1] Mr. Jones's identity is not apparent from the record. From the context, it appears that Mr. Jones is a court officer.

I discovered that they looked at, specifically they looked at [c]amera [a]ngle [n]o. 2. At about [twelve] hours, [two] minutes and about [two] seconds, you'll see that there is an object in [the Defendant's] hand. If that evidence had been introduced at trial, we would have tried to mitigate that situation because it is a sharp looking object in her hand. By showing the other camera angle, specifically one where she's outside getting into a vehicle, I believe that's [c]amera [a]ngle 16 towards the end of the footage, where she is not holding something in her right [hand] where that sharp object was in [c]amera [a]ngle 2.

In Jenkins, a 1992 case cited by the Defendant, a panel of this court held that the decision as to whether a jury should be allowed to review trial testimony is within the discretion of the trial court. 845 S.W.2d at 793. In doing so, the court noted that "[j]uries apply emphasis to evidence which is before them. Obviously, if they are allowed to rehear particular testimony at their request, there is benefit to be gained in assisting the jurors to decide issues based upon an accurate recollection of the evidence." Id. at 792. The court adopted Standard 15-4.2 of the ABA Standards Relating to the Administration of Criminal Justice[2] as the standard to be applied by a trial court responding to a jury's requests to rehear trial testimony:

> (a) If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, they shall be conducted to the courtroom. Whenever the jury's request is reasonable, the court, after notice to the prosecutor and counsel for the defense, shall have the requested parts of the testimony read to the jury and shall permit the jury to reexamine the requested materials admitted into evidence.

> (b) The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

Id. at 793.

---

[2] ABA Standards Relating to the Administration of Criminal Justice, Standard 15-4.2 was revised and redesignated 15-5.2. Revised Standard 15-5.2 refers only to a jury's request to rehear testimony, not review evidence. See State v. Marty William Thomas, No. E2003-00829-CCA-R3-CD 2004 WL 1592816, at *6 (Tenn. Crim. App. July 16, 2004). In Thomas, this court held, "In view of the revisions to Standard 15-4.2 and the addition of Rule 30.1 of the Tennessee Rules of Criminal Procedure, we conclude that revised Standard 15-5.2 should be the standard to be applied by a trial court responding to a jury's request to rehear trial testimony." Id.

Thereafter, Tennessee Rule of Criminal Procedure 30.1, which addresses the procedure for taking exhibits into the jury room, was adopted in 1995. It provides, "Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. The Advisory Commission Comments note that Rule 30.1 "changes the long-standing practice in Tennessee of not allowing the jury in criminal cases to take the exhibits to the jury room for their study and examination during deliberations." Tenn. R. Crim. P. 30.1, Advisory Comm'n cmts. Moreover, the Comments provide "[t]his rule, applicable in criminal cases, is mandatory unless the judge, either on motion of a party or sua sponte, determines that an exhibit should not be submitted to the jury." Id. In addition, good cause for keeping an exhibit from the jury room includes "that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury." Id.

Recently, the Tennessee Supreme Court discussed the application of Rule 30.1, stating, "This rule, however, does not address how jurors may view evidence, such as video recorded statements that require special equipment for viewing and cannot be appropriately examined or viewed in the jury room." State v. Davidson, 509 S.W.3d 156, 202 (Tenn. 2016). The court ultimately held that, "when a jury requests to view or hear evidence that cannot be appropriately examined in the jury room, the trial court should bring the jury into the courtroom with the parties and counsel present to view the evidence." Id. at 204.

From the colloquy during jury deliberations transcribed above, it is clear that defense counsel never objected to the procedure the trial court employed in allowing the jury to review the video in the jury room but, instead, complained only of permitting the jury to view the entire contents of the videotape rather than restricting them to the portions viewed at trial. Any procedural objection to the manner of viewing was not raised until the motion for new trial. Thus, the Defendant's procedural issue, alleging that "the jury was allowed to improperly focus on particular parts of the videos without any supervision from the trial court to protect [the Defendant's] right to a fair trial," is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Regardless, there is no indication from the record that the evidence could not be "appropriately examined in the jury room." See Davidson, 509 S.W.3d at 204. It appears that the jury was provided with a laptop to review the recording, that they were provided with the CD, and that there was "an IT guy" available to assist if needed. We cannot say that the trial court abused its discretion by allowing the jurors to review the video recording in the jury room.

Turning to the Defendant's substantive claim, he argues that the CD "contained additional videos that were not authenticated and placed into evidence." His substantive argument does not apply to all sixteen camera angles on the recording but simply to those video portions not played at trial. Rule 901(a) of the Tennessee Rules of Evidence states as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Evidence may be authenticated through testimony from a witness with knowledge that a matter is what it is claimed to be or by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tenn. R. Evid. 901(b)(1), (4). In addition, "[w]ithout drawing the boundaries of practical possibilities, the rule allows proof to the court of a myriad of distinctive characteristics that may convince the judge that a questioned document is authentic enough to let the jury consider it." Tenn. R. Evid. 901, Advisory Comm'n cmt.

Furthermore, evidence is "any species of proof, or probative matter, legally presented at the trial of an issue, by the act of the parties . . . for the purpose of inducing belief in the minds of the court or jury as to their contention." Black's Law Dictionary 498 (6th ed. 1990). Evidence includes "whatever is submitted to the judge or jury to elucidate an issue, to prove a case, or to establish or disprove a fact in issue." State v. Harris, 839 S.W.2d 54, 79 (Tenn. 1992) (citations omitted).

In State v. Michael Wayne Henry, the defendant was convicted of selling drugs, and the officers had audiotapes of the transactions. 1997 WL 283735, at *3 (Tenn. Crim. App. May 29, 1997). At trial, one of the officers testified that the conversations on the tapes were unintelligible, and although the tapes themselves were introduced into evidence, the tapes were not played for the jury. Id. During deliberations, the jury asked to listen to the tapes, but the trial court declined to allow them to do so. Id. On appeal, the defendant complained that the trial court erred in denying the jury's request to hear the tapes. However, this court held, "In this instance, the contents of the tapes were not in evidence. Neither the [S]tate nor the defense requested that the tapes or any portion thereof be played for the jury. The trial court properly denied the jury's request to review the tapes in the jury room." Id. at *4.

However, here, certain portions of the recordings were played to the jury during trial. In State v. Jessica Kennedy, this court addressed the effect of entering an entire recording as an exhibit while only playing portions of the recording for the jury. No. E2013-00260-CCA-R3-CD, 2014 WL 3764178, at *59-60 (Tenn. Crim. App. July 30, 2014). This court determined that the trial court did not abuse its discretion in allowing the defendant to only play portions of a video-recorded statement that was entered into evidence in its entirety in the interest of time. Id. at *60. This court reasoned that the

entire recording was entered as an exhibit and was available for the jury to view during its deliberations had it chosen to do so. Id. (citing Tenn. R. Crim. P. 30.1). This court stated that the trial court's ruling did not result in the exclusion of the evidence but limited the manner in which it was published to the jury. Id.; see also State v. Marvis Deshun Pollard, No. W2016-01788-CCA-R3-CD, 2017 WL 4877458, at *5 (Tenn. Crim. App. Oct. 30, 2017) (holding that when there was no indication that the jury's consideration of a recording was limited during deliberations, the entire video entered into evidence could support a review of the sufficiency of the evidence, even though only portions were published during trial).

Moreover, the Defendant made no offer of proof. We have only defense counsel's statement at the motion for new trial that just two of the sixteen camera angles were viewed during trial. However, during the discussion at trial, defense counsel stated that three of the camera angles on the disc were presented. Furthermore, during the victim's testimony, he identified the CD of the surveillance video footage, stating that he had previously reviewed the footage, presumably in its entirety, and dated and initialed the recording at that time. Thereafter, the surveillance video footage was entered into evidence in its entirety without objection. The victim was shown at least two camera angles from the surveillance video footage and narrated the events for the jury. The video was again shown to the victim on cross-examination, although it was not apparent if this was from the same angle or a different one. At no time during the victim's testimony did either counsel note which camera angle was being played. As noted above, Ms. Osborne and Detective Saxon reviewed portions of the video during their respective testimonies, but again what specific angles these witnesses were shown was not mentioned. It is impossible for us to address any substantive issue because we do not know which portions of the video recording were published to the jury.

We observe that the issues in this case are only tentatively suggested and the record is only partially and incompletely developed. See State v. Walls, 537 S.W.3d 892 (Tenn. 2017); State v. McGhee, 746 S.W.2d 460, 462 (Tenn. 1988). Thus, this issue is waived. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); Tenn. R. Evid. 103(a)(1) (noting that error may not be predicated on the admission of evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context"); Tenn. R. Evid. 103(a)(2) (stating that error "may not be predicated upon a ruling which . . . excludes evidence unless" an offer of proof was made or "the substance of the evidence" was "apparent from the context"). See also State v. Elvin Hubie Pearson and Marcus Anthony Pearson, No. M2007-02826-CCA-R3-CD, 2009 WL 1616678, at *11 (Tenn. Crim. App. June 10, 2009) (noting that the appellate court could not reach the merits of an allegation that a recording was improperly put before the jury because the record did not indicate

-15-

which portions were played). Moreover, both cashiers testified that the Defendant was in possession of knife, and the evidence of her guilt colluding with her co-defendant was overwhelming. Any error in the admission of this evidence was harmless. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE